## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| BRIAN HALL, individually and on behalf of all others similarly situated, | Case No.: 2:15-cv-13844 |
| Plaintiff, | **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| FORBES MEDIA LLC, a Delaware limited liability company, | |
| Defendant. | |

Plaintiff Brian Hall brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Forbes Media LLC to obtain redress for all persons injured by its intentional and unlawful disclosure of Plaintiff's and a proposed Class of consumers' sensitive and statutorily protected information. Plaintiff, for his Complaint, alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

### NATURE OF THE CASE

1.     *Forbes* magazine is a well-known publication that features finance, investing, and other business-related news.

2.     Unfortunately for its subscribers, Forbes supplements its sales and advertising revenues by secretly selling their statutorily protected information—

1

including their full names, the title of the magazine they subscribed to, and home addresses (collectively "Personal Reading Information")—to data miners and other unrelated third party companies. Forbes also trades its subscribers' Personal Reading Information with other data miners and aggregators for the purpose of "appending" (*i.e.*, supplementing) its customer files with other highly sensitive data about them, such as e-mail addresses, age, gender, length of residence, marital status, presence or absence of children in the household, household income, net worth, retirement status, and even whether the subscriber is a grandparent or not. By enhancing its customers' Personal Reading Information in this way, Forbes is able to increase the "street value" of its customer lists and sell or trade them at a higher premium.

3.     In order to facilitate its surreptitious multi-million dollar disclosure business, Forbes hides its practices from its subscribers, and neither notifies them nor obtains their permission before disclosing their Personal Reading Information to unrelated third parties.

4.     Forbes's disclosure practices squarely violate Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711–15—a broad consumer protection statute popularly referred to as the Video Rental Privacy Act ("VRPA"). The VRPA prohibits companies like Forbes from disclosing—without written permission—any information that specifically identifies a person as having

purchased written materials, such as magazines.

5.      Accordingly, Plaintiff Hall brings this Complaint against Forbes for its intentional and unlawful disclosure of its subscribers' Personal Reading Information in violation of the VRPA, as well as for its unjust enrichment from such practices.

## PARTIES

6.      Plaintiff Brian Hall is a natural person and citizen of the State of Michigan.

7.      Defendant Forbes Media LLC is a Delaware limited liability company with its principal place of business located at 499 Washington Boulevard, Jersey City, New Jersey 07310. Forbes is also registered to conduct business in the State of Michigan (as Michigan Department of Licensing and Regulatory Affairs ID Number B9027U). Forbes conducts business throughout this District, the State of Michigan, and the United States.

## JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over Forbes because it is registered to, and regularly does, conduct business in this District, including by soliciting business from, and entering into transactions with, consumers located in this District. Further, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from this District.

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because at least one Class member is a citizen of a State different than Defendant, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and none of the exceptions under that subsection apply to this action.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred in this District. Venue is additionally proper because Plaintiff Hall resides within this District and Defendant conducts significant business in this District, including soliciting consumer business and entering into consumer transactions here.

## FACTUAL BACKGROUND

### I.      An Overview of the VRPA.

11.     In 1988, after the public disclosure of then-Supreme Court nominee Robert Bork's (and his family's) video viewing records, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into [their] loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

12.     Congress responded by passing the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA")—which, as enacted, regulates a certain type of business (a "video tape service provider") and a narrow subset of consumer information (that is, "information which identifies a person as having requested or obtained specific video materials or services"). Although this statute initially also sought to "protect[] the selection of books that [consumers] read," 134 Cong. Rec. S5399 (May 10, 1988), the final version of the VPPA was limited to video materials. *See* 18 U.S.C. § 2710.

13.     The Michigan Legislature, however, decided that the federal VPPA didn't go far enough, and expressed concern that Michigan consumers' "choice[s] in reading, music, and video entertainment [were] a private matter, and not fit for consideration by gossipy publications, employers, clubs, or anyone else." H.B. No. 5331 (Jan. 20, 1989).

14.     As a result, in 1989, the VRPA was enacted "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials[,]" including written materials such as books and magazines. M.C.L. Ch. 445. The VRPA therefore provides, in relevant part, that:

> a person, or an employee or agent of the person, engaged in the business selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase lease, rental, or borrowing of those materials

by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.

15.     As such, and in comparison to its more limited federal analogue, the

Michigan VRPA expressly regulates a broader set of businesses (those engaged in,

among other things, "the business of selling at retail . . . written materials") and

protects a wider array of consumer information (*i.e.*, any "record or information

concerning the purchase, rental, or borrowing of those materials by a customer that

indicates the identity of the customer"). *Compare* 18 U.S.C. § 2710 *with* M.C.L. §

445.1712.

## II.     Consumers' Personal Information Has Real Value.

16.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson

Swindle remarked that "the digital revolution . . . has given an enormous capacity

to the acts of collecting and transmitting and flowing of information, unlike

anything we've ever seen in our lifetimes . . . and individuals are concerned about

being defined by the existing data on themselves."[1]

17.     More than a decade later, Commissioner Swindle's comments ring

---

[1]     *The Information Marketplace: Merging and Exchanging Consumer Data*,
Federal Trade Commission, 8, 11 (Mar. 13, 2001), *available at*
http://www.ftc.gov/sites/default/files/documents/public_events/information-
marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last accessed
Oct. 30, 2015).

[2]     *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*,

truer than ever, as consumer data feeds an information marketplace that supports a

$26 billion dollar per year online advertising industry in the United States.[2]

18.     The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of
> information collected by businesses, or why their information may be
> commercially valuable. *Data is currency. The larger the data set, the
> greater potential for analysis—and profit.*[3]

19.     In fact, an entire industry exists where companies known as data

miners purchase, trade, and otherwise collect massive databases of information

about consumers. Data miners then profit by selling this "extraordinarily intrusive"

information in an open and largely unregulated market.[4]

20.     The scope of data miners' knowledge of consumers' private

information is immense: "If you are an American adult, the odds are that [they]

---

[2]     *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*,
WSJ.com (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html (last visited Oct. 30, 2015).

[3]     Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable*,
Federal Trade Commission, 2 (Dec. 7, 2009), *available at*
http://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-
exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed Oct. 30,
2015) (emphasis added).

[4]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*,
TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-
knows-what-youre-doing-right-now/ (last visited Oct. 30, 2015).

know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

21.     Recognizing the serious threat the data mining industry poses to consumers' privacy, the Co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent letters to nine major data brokerage companies seeking information on how those companies compile, store, and sell their massive collections of consumer data.[6] In their letters, the Co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on almost every U.S. consumer.* This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[7]

---

[5]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, The New York Times (June 16, 2012), http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Oct. 30, 2015).

[6]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Senator Ed Markey, http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Oct. 30, 2015).

[7]     *See*, *e.g.*, Letter from Edward J. Markey and Joe Barton, Co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 2, 2012), *available at* http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter.pdf) (last accessed Oct. 30, 2015) (emphasis added).

22.     Unfortunately, magazine publishers like Forbes commonly engage in these practices by participating in "database cooperatives," where publishers can engage in the *quid pro quo* swapping of access to their respective customer lists that, by its nature, involves the disclosure of customers' Personal Reading Information.

23.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

**III.    Forbes Unlawfully Discloses its Subscribers' Personal Reading Information.**

24.     Forbes maintains a vast digital database comprised of its subscribers' Personal Reading Information.

25.     Without seeking permission to do so, Forbes discloses this information to data mining companies who then supplement it with additional sensitive personal information about each subscriber—such as their e-mail addresses, age, gender, length of residence, marital status, presence or absence of children in the household, household income, net worth, retirement status, and even whether the subscriber is a grandparent or not.

26.     This, in turn, allows Forbes to amass highly detailed customer lists—

sorted by, among other things, its subscribers' specific reading habits (*i.e.*, the specific magazine they've purchased and subscribed to) and demographic details (including the sensitive information described above that Forbes has obtained from data miners)—which it can then sell and otherwise disclose at a higher premium to interested third parties.

27.    Unfortunately, Forbes actively conceals these invasive data disclosure practices from its subscribers. In fact, regardless of how consumers purchase subscriptions to its publication, they are never presented with Forbes's terms of service, privacy policy, or information-sharing policy. Consequently, Forbes uniformly fails to obtain any form of consent from—or even provide effective notice to—its subscribers before disclosing their Personal Reading Information to third parties.

28.    By and through these actions, Forbes not only disregards its subscribers' privacy, it also violates the VRPA.

**FACTS RELATING TO BRIAN HALL**

29.    Plaintiff Brian Hall is a citizen of the State of Michigan.

30.    Hall purchased a one-year subscription to *Forbes* from Defendant starting in August 2009.

31.    *Forbes* is a magazine published, owned, and operated by Defendant.

32.    Hall has never agreed in writing or otherwise to allow Defendant to

sell or disclose his Personal Reading Information to any unrelated third parties.

33.     Hall did not receive notice of such disclosures before Defendant disclosed his Personal Reading Information to unrelated third parties.

34.     Defendant disclosed Hall's Personal Reading Information (*i.e.*, information that identifies Hall as having purchased a subscription to *Forbes*)—without obtaining his permission or providing prior notice—to data mining companies, who appended the information with data from their own records.

35.     During this same time period, Defendant also disclosed Hall's Personal Reading Information to other unrelated third party companies, including so-called "database cooperatives" without first obtaining his consent or giving him prior notice of the disclosures.

36.     These disclosures to unrelated third party companies squarely violated the VRPA.

37.     Further, and even though it lacked permission to even disclose his Personal Reading Information in the first place, Defendant profited from its disclosures of Hall's Personal Reading Information.

38.     Ultimately, what Hall received (a subscription without privacy protections) was substantially less valuable than what he paid for (a subscription with accompanying privacy protections). Had he known that Defendant would disclose his Personal Reading Information to third parties without his permission,

Hall would not have purchased his subscription. Thus, Hall has suffered concrete

economic harm in the form of the monies paid to Defendant in exchange for the

magazine subscription.

## CLASS ACTION ALLEGATIONS

39.    **Class Definition**: Plaintiff Hall brings this action on behalf of himself

and a proposed Class, defined as follows:

> All Michigan residents who purchased a subscription to *Forbes*
> magazine.

The following people are excluded from the Class: (1) any Judge or Magistrate

presiding over this action and members of their families; (2) Defendant,

Defendant's subsidiaries, parents, successors, predecessors, and any entity in

which the Defendant or its parents have a controlling interest and its current or

former employees, officers and directors; (3) persons who properly execute and

file a timely request for exclusion from the Class; (4) persons whose claims in this

matter have been finally adjudicated on the merits or otherwise released; (5)

Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives,

successors, and assigns of any such excluded persons.

40.    **Numerosity**: The exact number of Class members is unknown to

Plaintiff at this time, but it is clear that individual joinder of each Class member is

impracticable. Defendant has disclosed the Personal Reading Information of

thousands of consumers who fall into the definition of the Class. Ultimately,

members of the Class will be easily identified through Defendant's records.

41.    **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)    Whether Defendant is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

(b)    Whether Defendant obtained written permission before disclosing Plaintiff's and the Class's Personal Reading Information to third parties;

(c)    Whether Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information violated the VRPA; and

(d)    Whether Defendant was unjustly enriched through its conduct described herein.

42.    **Typicality**: Plaintiff's claims are typical of the claims of the other Class members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

43.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this

action on behalf of the Class members, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to those of the other Class members.

44.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

45.    **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all Class members is impracticable. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendant's misconduct on an individual basis. Even if Class members could sustain individual litigation, it would not be preferable to a class action, because

individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

46.     Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

### FIRST CAUSE OF ACTION
### Violation of M.C.L. § 445.1712
### (On Behalf of Plaintiff and the Class)

47.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

48.     As a magazine publisher that sells subscriptions directly to consumers, Defendant is engaged in the business of selling written materials at retail. *See* M.C.L. § 445.1712.

49.     By purchasing a subscription to *Forbes* from Defendant, Hall purchased written materials at retail from Defendant. *See* M.C.L. § 445.1712.

50.     Because Hall purchased written materials at retail from Defendant, he is a "customer" within the meaning of the VRPA. *See* M.C.L. § 445.1711(a).

51.     Beginning when Hall first subscribed to *Forbes*, Defendant disclosed

his Personal Reading Information, which identified him as a *Forbes* subscriber, in at least two ways.

52.     First, Defendant disclosed customer lists containing Hall's Personal Reading Information to data mining companies who then supplemented the lists with additional sensitive information from their own databases.

53.     Second, Defendant disclosed customer lists containing Hall's Personal Reading Information to other third party companies that, in turn, sold and/or disclosed those lists (or access to those lists) to a number of other parties—including other magazine publishers.

54.     By disclosing its customer lists, Defendant disclosed to persons other than Plaintiff, records or information concerning his purchase of written materials from Defendant. *See* M.C.L. § 445.1712.

55.     The information disclosed by Defendant communicates Hall's name and address, as well as the fact that he subscribed to *Forbes.* Accordingly, the records or information disclosed by Defendant indicates Hall's identity. *See* M.C.L. § 445.1712.

56.     Hall never provided Defendant with consent to disclose his Personal Reading Information to anyone—in writing or otherwise.

57.     Worse still, Hall did not receive any prior notice of Defendant's disclosures of his Personal Reading Information to third parties.

58.     On information and belief, Defendant's disclosures of Hall's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

59.     Defendant's disclosures of Hall's Personal Reading Information were not made to collect payment for his subscriptions.

60.     Defendant's disclosures of Hall's Personal Reading information were made to third parties, including data miners and database cooperatives, in order to increase Defendant's revenue and ability to prospectively market its own products—*i.e.*, subscriptions to *Forbes*—to the subscribers of *other* publications (among other reasons). Accordingly, Defendant's disclosures were not made for the exclusive purpose of marketing goods and services directly to Hall.

61.     By disclosing Hall's Personal Reading Information, Defendant violated Hall's common law right to privacy.

62.     By disclosing Hall's Personal Reading Information, Defendant violated Hall's statutorily protected right to privacy in his reading habits. *See* M.C.L. § 445.1712.

63.     Further, because Hall paid money to Defendant for his *Forbes* subscription, and Defendant was obligated to comply with the VRPA, Defendant's unlawful disclosure of Hall's Personal Reading Information deprived him of the full value of his paid-for subscription. As such, and also because Hall ascribes

monetary value to the privacy of his Personal Reading Information, Defendant's unlawful disclosure of his Personal Reading Information caused him to receive less value than he paid for, thereby causing him economic harm.

64. Likewise, because Hall and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private pursuant to the VRPA is more valuable than one that does not.

65. Accordingly, had Hall known of Defendant's surreptitious disclosure practices at or before the time of his purchase, he would not have purchased his *Forbes* magazine subscription. Thus, Defendant's unlawful disclosures caused Hall economic harm in the form of the purchase price of the magazine subscription.

66. As described herein, Defendant generates substantial revenue by disclosing Hall's and the Class's Personal Reading Information to data miners and other unrelated third parties.

67. As a result of Defendant's unlawful and continued disclosure of their Personal Reading Information, Hall and the other Class members have suffered privacy and economic injuries. Accordingly, on behalf of himself and the Class, Hall seeks: (1) an injunction prohibiting Defendant from disclosing his and the Class's Personal Reading Information without first obtaining their written permission (*i.e.*, as required by the VRPA); (2) actual damages or $5,000.00,

whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3)

costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

68.     Plaintiff incorporates the foregoing allegations as if fully set forth

herein.

69.     Plaintiff Hall and the Class members conferred a benefit on Defendant

by providing Defendant with their Personal Reading Information and paying

Defendant for their magazine subscriptions. Defendant received and retained the

information and money belonging to Hall and the Class when they purchased their

subscriptions to Defendant's publication.

70.     Because Defendant received and processed Hall's and the Class's

subscription payments and Personal Reading Information, and because Defendant

processes and fulfills the subscriptions and discloses Hall's and the Class's

Personal Reading Information to third parties, Defendant appreciates and/or has

knowledge of such benefits.

71.     Under the VRPA, Hall and the Class members were entitled to

confidentiality in their Personal Reading Information as part of their subscriptions.

72.     Under principles of equity and good conscience, Defendant should not

be allowed to retain the full amount of money Hall and the Class paid for their

19

subscriptions, or the money it received by disclosing Hall's and the Class's

Personal Reading Information because Defendant failed to comply with the VRPA.

73.    Hall and the other Class members have suffered actual damages as a

result of Defendant's unlawful conduct in the form of the monies paid for their

magazine subscriptions, which they wouldn't have purchased had they known of

Defendant's unlawful disclosure practices.

74.    To prevent inequity, Defendant should return to Hall and the Class all

monies that they paid for their magazine subscriptions, and disgorge any profits

derived from the disclosures at issue.

75.    Accordingly, on behalf of himself and the Class, Hall seeks an order

declaring that Defendant's conduct constitutes unjust enrichment, and awarding

him and the Class restitution in an amount equal to that which they paid to

Defendant for their magazine subscriptions, as well as disgorgement of all profits

derived by Defendant as a result of its unlawful disclosures of Hall's and the

Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Brian Hall, on behalf of himself and the Class,

prays that the Court enter judgment in his favor and against Defendant, and for the

following relief:

(1)    Certify the Class as defined above, appoint Plaintiff Hall as Class

Representative, and designate his counsel as Class Counsel;

(2)    Declare that Defendant's conduct as described herein violates the VRPA;

(3)    Declare that Defendant's conduct as described herein constitutes unjust enrichment;

(4)    Award actual damages, including disgorgement, or $5,000.00, whichever is greater, to each Class member, as provided by the VRPA;

(5)    Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to cease the unlawful disclosures discussed herein;

(6)    Award reasonable attorneys' fees and costs pursuant to M.C.L. § 445.1715(b); and

(7)    Such other and further relief as the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

**BRIAN HALL**, individually and on behalf of all others similarly situated,

Dated: October 30, 2015                    By: /s/ Ari J. Scharg
                                              One of Plaintiff's Attorneys

Ari J. Scharg
ascharg@edelson.com

21

Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Henry M. Scharg (P28804)
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.671.0335

*Counsel for Plaintiff and the Putative Class*